Filed 3/17/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRETT LONG,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PROVIDE COMMERCE, INC.,<br><br>    Defendant and Appellant. | B257910<br><br>(Los Angeles County<br>Super. Ct. No. BC513925) |

    APPEAL from an order of the Superior Court of Los Angeles County, Jane L. Johnson, Judge.  Affirmed.

    Cooley, Michael G. Rhodes, Leo P. Norton and Shannon Sorrells for Defendant and Appellant.

    Milstein Adelman, Paul D. Stevens, Mayo L. Makarczyk; Flaherty Hennessy, Raquel A. Flaherty and Sarah L. Gough for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant Provide Commerce, Inc. (Provide) appeals from an order denying its petition to compel arbitration of certain consumer fraud claims brought by Plaintiff Brett Long on behalf of himself and a putative class of California consumers who purchased flower arrangements through Provide's website, ProFlowers.com. Provide sought to compel arbitration based on a provision contained in the company's "Terms of Use," which were viewable via a hyperlink displayed at the bottom of each page on the ProFlowers.com website.

The Terms of Use on ProFlowers.com fall into a category of Internet contracts commonly referred to as "browsewrap" agreements. Unlike the other common form of Internet contract—known as "clickwrap" agreements—browsewrap agreements do not require users to affirmatively click a button to confirm their assent to the agreement's terms; instead, a user's assent is inferred from his or her use of the website. Because assent must be inferred, the determination of whether a binding browsewrap agreement has been formed depends on whether the user had actual or constructive knowledge of the website's terms and conditions.

Plaintiff opposed the petition to compel arbitration on the ground that he was never prompted to assent to the Terms of Use, nor did he actually read them, prior to placing his order on ProFlowers.com. The trial court concluded the Terms of Use hyperlinks were too inconspicuous to impose constructive knowledge on Plaintiff, and denied the petition as such. We likewise find the hyperlinks and the overall design of the ProFlowers.com website would not have put a reasonably prudent Internet user on notice of Provide's Terms of Use, and Plaintiff therefore did not unambiguously assent to the subject arbitration provision simply by placing an order on ProFlowers.com. We affirm.[1]

---

[1]     For the same reason, we likewise affirm the trial court's order denying Provide's motion to transfer venue. Because Plaintiff did not assent to Provide's Terms of Use, he was not bound by the forum selection clause contained therein.

## FACTS AND PROCEDURAL BACKGROUND

There is no material dispute about the underlying facts. Provide is an online retailer that owns and operates several websites, including ProFlowers.com. Through ProFlowers.com, Provide advertises and sells a variety of floral products, which are shipped to order from the grower to the online customer.

Plaintiff alleges he purchased a floral arrangement on ProFlowers.com, which had been depicted and advertised on the website as a "completed assembled product," but which was delivered as a "do-it yourself kit in a box requiring assembly by the recipient."[2] Based on this allegation, Plaintiff sued Provide in the superior court, asserting claims for violations of the California Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.) and Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) on behalf of himself and a putative class of California consumers who purchased similarly advertised floral arrangements on ProFlowers.com.

Provide moved to compel arbitration pursuant to the Federal Arbitration Act (9 U.S.C. § 1), arguing Plaintiff was bound by the Terms of Use for ProFlowers.com, including the Dispute Resolution provision contained therein. Provide's evidence, consisting of a series of screen shots from the ProFlowers.com website, showed that at the time Plaintiff placed his order, the Terms of Use were available via a capitalized and underlined hyperlink titled "TERMS OF USE" located at the bottom of each webpage. The hyperlink was displayed in what appears to have been a light green typeface on the website's lime green background, and was situated among 14 other capitalized and underlined hyperlinks of the same color, font and size.

---

[2]     The evidence shows Plaintiff purchased a Mother's Day card and floral arrangement from ProFlowers.com for delivery to his mother in Kansas on the day before Mother's Day in 2013.

3

Provide's evidence also showed that, to complete his order, Plaintiff was required to input information and click through a multi-webpage "checkout flow." The checkout flow screenshots show the customer information fields and click-through buttons displayed in a bright white box set against the website's lime green background. At the bottom of the white box was a notice indicating "**Your order is safe and secure**," displayed next to a "VeriSign Secured" logo. Below the white box was a dark green bar with a hyperlink titled "SITE FEEDBACK" displayed in light green typeface. Finally, below the dark green bar, at the bottom of each checkout flow page, were two hyperlinks titled "<u>PRIVACY POLICY</u>" and "<u>TERMS OF USE,</u>" displayed in the same light green typeface on the website's lime green background.

After Plaintiff placed his order on ProFlowers.com, Provide sent him an email confirming the order. The email, beginning from the top, displayed the ProFlowers logo alongside the title "order confirmation." This was followed by a dark green bar with several hyperlinks to apparent product offerings titled "Birthday," "Anniversary," "Get Well," "Roses," "Plants," and "Gourmet Gifts." Next, the email displayed a light green bar thanking Plaintiff for his order, followed by order summary information, including the order number, shipping address, delivery date, the product ordered, and a billing breakdown for the product, delivery charge, tax, and total charge. The order details were followed by two banner advertisements, then a notification regarding online account management services, with four hyperlinks to account management pages on ProFlowers.com. Another dark green bar with the text "Our Family of Brands" followed the account management hyperlinks, then six brand logos for "ProFlowers," "*red*ENVELOPE," "ProPlants," "Shari's Berries," "CHERRY MOON FARMS," and "personalcreations.com." Next, the email included a paragraph listing customer service contact information in small grey typeset. Then, in the same grey typeset, were two hyperlinks titled "<u>Privacy Policy</u>" and "<u>Terms</u>". Finally, the email listed Provide's corporate address, again in the same grey typeset.

According to Plaintiff's declaration in opposition to Provide's petition to compel arbitration, Plaintiff "did not notice a reference of any kind to ProFlowers 'Terms and Conditions' nor a hyperlink to ProFlowers 'Terms of Use' " when he purchased flowers for delivery on ProFlowers.com.  Had Plaintiff noticed the hyperlink and clicked on it, he would have been taken to a page containing the full text of the Terms of Use, which began with the following notice:  "**By using any one of our Sites, you . . . acknowledge that you have read, understand, and expressly agree to be legally bound by these Terms and Conditions.**"[3]  Later, under the heading "Dispute Resolution," Plaintiff would have found the following arbitration provision:

> "***Agreement to Arbitrate Disputes:***  BY ACCESSING OR USING THE SITES, YOU EXPRESSLY AGREE THAT ANY LEGAL CLAIM, DISPUTE OR OTHER CONTROVERSY BETWEEN YOU AND PROVIDE COMMERCE ARISING OUT OF OR OTHERWISE RELATING IN ANY WAY TO THE SITES . . . SHALL BE RESOLVED IN CONFIDENTIAL BINDING ARBITRATION CONDUCTED BEFORE ONE COMMERCIAL ARBITRATOR FROM THE AMERICAN ARBITRATION ASSOCIATION ('AAA'), RATHER THAN IN A COURT, AS DESCRIBED HEREIN. . . . YOU SPECIFICALLY AGREE THAT YOU ARE BOUND TO RESOLVE ALL DISPUTES IN ARBITRATION, AND YOU ACKNOWLEDGE THAT YOU ARE VOLUNTARILY AND KNOWINGLY FORFEITING YOUR RIGHT TO A TRIAL BY JURY AND TO OTHERWISE PROCEED IN A LAWSUIT IN STATE OR FEDERAL COURT."

Plaintiff argued he was not bound by the foregoing arbitration provision because he neither had notice of nor assented to the Terms of Use.  In response, Provide argued the placement of the Terms of Use hyperlinks, particularly within the checkout flow, coupled with the hyperlink to "Terms" in the subsequent order confirmation email, was

---

[3]     ProFlowers.com is among the "Sites" listed in Provide's Terms of Use.

sufficiently conspicuous to put Plaintiff on inquiry notice as to the contents of the agreement. Accordingly, Provide maintained Plaintiff's decision to continue with the order, whether he took the time to review the Terms of Use or not, was sufficient to establish his assent to be bound by the arbitration and venue provisions contained therein. The trial court agreed with Plaintiff, concluding the hyperlinks were too inconspicuous to put a reasonably prudent Internet consumer on inquiry notice. Provide now appeals this order.

## DISCUSSION

A. *Legal Principles; Arbitration and Browsewrap Agreements*

"Under 'both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate.' " (*Cruise v. Kroger Co.* (2015) 233 Cal.App.4th 390, 396, italics omitted.) This threshold inquiry stems from the " 'basic premise that arbitration is consensual in nature.' " (*Lawrence v. Walzer & Gabrielson* (1989) 207 Cal.App.3d 1501, 1505.) "The fundamental assumption of arbitration is that it may be invoked as an alternative to the settlement of disputes through the judicial process 'solely by reason of an exercise of choice by [all] parties.' " (*Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 355.) Thus, notwithstanding " 'the cogency of the policy favoring arbitration and despite frequent judicial utterances that because of that policy every intendment must be indulged in favor of finding an agreement to arbitrate, the policy favoring arbitration cannot displace the necessity for a voluntary agreement to arbitrate.' " (*Lawrence,* at p. 1505.) As our Supreme Court has observed, "[t]here is indeed a strong policy in favor of enforcing agreements to arbitrate, but there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." (*Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 481.)

This requirement applies with equal force to arbitration provisions contained in contracts purportedly formed over the Internet. While Internet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that " '[m]utual manifestation of assent, whether by written or spoken word or by conduct, is

6

the touchstone of contract.' " (*Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171, 1175 (*Nguyen*).) " ' "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." [Citations.]' " (*HM DG, Inc. v. Amini* (2013) 219 Cal.App.4th 1100, 1109 (*HM DG*).) In applying this objective standard, outward manifestations of a party's supposed assent are to be judged with due regard for the context in which they arise. California law is clear—"an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." (*Windsor Mills, Inc. v. Collins & Aikman Corp*. (1972) 25 Cal.App.3d 987, 993; see *Specht v. Netscape Communs. Corp*. (2d Cir. 2002) 306 F.3d 17, 30 (*Specht*) [applying California law to commercial Internet transaction].)

"Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." (*Nguyen, supra,* 763 F.3d at pp. 1175-1176.) The parties agree that the subject Terms of Use for the ProFlowers.com website falls into the browsewrap category.

" 'Unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly . . . [a] party instead gives his assent simply by using the website.' [Citation.] Indeed, 'in a pure-form browsewrap agreement, "the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." ' [Citations.] Thus, 'by visiting the website—something that the user has already done—the user agrees to the Terms of Use not listed on the site itself but available only by clicking a hyperlink.' [Citation.] 'The defining feature of browsewrap agreements is that the user can continue to use the

7

website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists.' [Citation.] 'Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions.' " (*Nguyen, supra,* 763 F.3d at p. 1176.) More to the point here, absent actual notice, "the validity of [a] browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." (*Id.* at p. 1177.)

With these foundational legal principles in place, we turn our focus to the specifics of the browsewrap agreement in the instant case, and whether the design of Provide's website and order confirmation email were sufficient to conclude Plaintiff agreed to be bound the Terms of Use and arbitration provision contained therein simply by placing his order on ProFlowers.com.

B. *The "Terms of Use" Hyperlinks Are Not Sufficiently Conspicuous to Put a Reasonably Prudent Internet Consumer on Inquiry Notice; Plaintiff Did Not Manifest His Unambiguous Assent to Be Bound by the Terms of Use*

Provide does not dispute Plaintiff's testimony that he had no actual knowledge of the Terms of Use when he placed his order on ProFlowers.com. Accordingly, we must decide whether the design of the ProFlowers.com website and/or the conspicuousness of the hyperlinks to the Terms of Use were sufficient to put a reasonably prudent Internet consumer on inquiry notice of the browsewrap agreement's existence and contents. (See *Nguyen, supra,* 763 F.3d at p. 1177.) Because the material evidence consists exclusively of screenshots from the website and order confirmation email, and the authenticity of these screenshots is not subject to a factual dispute, we review the issue de novo as a pure question of law. (See *HM DG, supra,* 219 Cal.App.4th at p. 1109 [" 'if the material facts are certain or undisputed, the existence of a contract is a question for the court to decide' "].)

8

It appears that no California appellate court has yet addressed what sort of website design elements would be necessary or sufficient to deem a browsewrap agreement valid in the absence of actual notice. Accordingly, in addition to the general contract principles discussed above, our analysis is largely guided by two federal cases from the Second and Ninth Circuit Courts of Appeals, each of which considered the enforceability of a browsewrap agreement applying the objective manifestation of assent analysis dictated by California law. (See *Specht, supra,* 306 F.3d at p. 30, fn. 13; *Nguyen, supra,* 763 F.3d at p. 1175.) In keeping with the principles articulated in these authorities, we conclude the design of the ProFlowers.com website, even when coupled with the hyperlink contained in the confirmation email, was insufficient to put Plaintiff on inquiry notice of the subject Terms of Use.

In *Specht*, the Second Circuit declined to enforce an arbitration provision contained in a software licensing browsewrap agreement where the hyperlink to the agreement appeared on "a submerged screen" below the " 'Download' " button that the plaintiffs clicked to initiate the software download. (*Specht, supra,* 306 F.3d at pp. 30-32.) After reviewing California contract law, the *Specht* court acknowledged that a user's act of clicking a download button, combined with " 'circumstances sufficient to put a prudent man upon inquiry' " as to the existence of licensing terms, would constitute a sufficient manifestation of assent to be bound. (*Id.* at p. 31.) However, the court was quick to point out that the opposite must also be true—that "a consumer's clicking on a download button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms." (*Id.* at pp. 29-30.) The design of the defendant's website, the *Specht* court concluded, exemplified the latter circumstance.

Though the website advised users to " 'Please review and agree to the terms of the . . . software license agreement before downloading and using the software,' " the *Specht* court emphasized that users would have encountered this advisement only if they scrolled down to the screen below the website's invitation to download the software by clicking the download button. (*Specht, supra,* 306 F.3d at p. 23.) This meant that when the plaintiffs clicked the download button, they "were responding to an offer that did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms." (*Id.* at p. 31.) The fact that users might have noticed from the position of the scroll bar that an unexplored portion of the webpage remained below the download button did not change the reasonableness calculation. Under the circumstances presented, "where consumers [were] urged to download free software at the immediate click of a button," the *Specht* court concluded placing the notice of licensing terms on a submerged page " 'tended to conceal the fact that [downloading the software] was an express acceptance of [the defendant's] rules and regulations.' " (*Id.* at p. 32.) Thus, notwithstanding what the plaintiffs might have found had they taken " 'as much time as they need[ed]' to scroll through multiple screens on a webpage" (*ibid.*), the *Specht* court held that "a reasonably prudent offeree in plaintiffs' position would not have known or learned . . . of the reference to [the software's] license terms hidden below the 'Download' button on the next screen." (*Id.* at p. 35.)

More than a decade after the Second Circuit decided *Specht*, the Ninth Circuit in *Nguyen* considered whether the conspicuous placement of a "Terms of Use" hyperlink, standing alone, would be sufficient to put an Internet consumer on inquiry notice. (*Nguyen, supra,* 763 F.3d at p. 1178.) Unlike in *Specht*, the hyperlink in *Nguyen* was visible "without scrolling" on some of the website's pages, while on others "the hyperlink [was] close enough to the 'Proceed with Checkout' button that a user would have to bring the link within his field of vision" to complete an online order. (*Ibid.*) These differences with *Specht* notwithstanding, the *Nguyen* court concluded the plaintiff's act of placing an order did not constitute an unambiguous manifestation of assent to be bound by the browsewrap agreement, holding "proximity or conspicuousness of the hyperlink alone is

10

not enough to give rise to constructive notice" (*Ibid.*)  The court reasoned that *Specht* had only identified a circumstance that was *not sufficient* to impart inquiry notice—where the only reference to license terms appeared on a submerged screen.  (*Ibid.*)  But in cases where courts had "relied on the proximity of the hyperlink *to enforce* a browsewrap agreement," the *Nguyen* court explained, those websites had "also included something more to capture the user's attention and secure her assent."  (*Id.* at p. 1178, fn. 1, italics added.)  Typically that "something more" had taken the form of an explicit textual notice warning users to " 'Review terms' " or admonishing users that by clicking a button to complete the transaction " 'you agree to the terms and conditions in the [agreement].' " (*Id.* at p. 1178 & fn. 1.)  From those cases, the *Nguyen* court derived the following bright line rule for determining the validity of browsewrap agreements:  "[W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice."  (*Id.* at pp. 1178-1179.)

Provide argues we should disregard *Nguyen* as an outlier case, and follow *Specht* to the extent it suggests a conspicuous hyperlink that provides " 'immediately visible notice' " of a browsewrap agreement is sufficient, standing alone, to put a reasonably prudent Internet consumer on inquiry notice of the agreement's terms.  In that regard, Provide observes that "in *Specht*, the *only* reference to license terms appeared *on a submerged screen out of sight to users when they clicked on buttons to download software*."  In contrast, Provide argues the Terms of Use hyperlink on ProFlowers.com "is immediately visible on the checkout flow, is viewable without scrolling, and located next to several fields that the website user is required to fill out and the buttons he must click to complete an order."  Given this distinction, Provide argues the hyperlink was sufficiently conspicuous to "put a reasonable user on notice of the Terms of Use."  We disagree.

Though it may be that an especially observant Internet consumer could spot the Terms of Use hyperlinks on some checkout flow pages without scrolling, that quality alone cannot be all that is required to establish the existence of an enforceable browsewrap agreement. Rather, as the *Specht* court observed, "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." (*Specht, supra,* 306 F.3d at p. 35.) Here, the Terms of Use hyperlinks— their placement, color, size and other qualities relative to the ProFlowers.com website's overall design—are simply too inconspicuous to meet that standard.

Indeed, our review of the screenshots reveals how difficult it is to find the Terms of Use hyperlinks in the checkout flow *even when one is looking for them.*[4] This of course is to say nothing of how observant an Internet consumer must be to discover the hyperlinks in the usual circumstance of using ProFlowers.com *to purchase flowers*, without any forewarning that he should also be on the lookout for a reference to "Terms of Use" somewhere on the website's various pages. Contrary to Provide's characterization, the subject hyperlinks in the checkout flow are not "located next to" the fields and buttons a consumer must interact with to complete his order. Those fields and buttons are contained in a separate bright white box in the center of the page that contrasts sharply with the website's lime green background. To find a Terms of Use hyperlink in the checkout flow, a consumer placing an order must (1) remove his attention from the fields in which he is asked to enter his information; (2) look below the buttons he must click to proceed with the order; (3) look even further below a "VeriSign Secured" logo and notification advising him that his "**order is safe and secure**," which itself includes a hyperlink to "**Click here** for more details"; (4) look still further below a thick dark green bar with a hyperlink for "SITE FEEDBACK"; and (5) finally find the "TERMS OF USE" hyperlink situated to the right of another hyperlink for the website's

---

[4] We focus our analysis on the checkout flow as Provide concedes the placement of Terms of Use hyperlink on the product webpage is "less conspicuous."

12

"PRIVACY POLICY," both of which appear in the same font and light green typeface that, to the unwary flower purchaser, could blend in with the website's lime green background. True, on a handful of these pages no scrolling is required to complete the hunt. But that, in our assessment, does not change the practical reality that the checkout flow is laid out " 'in such a manner that it tended to conceal the fact that [placing an order] was an express acceptance of [Provide's] rules and regulations.' " (*Specht, supra,* 306 F.3d at p. 32.)

As for Provide's contention that the subsequent order confirmation email somehow provides the notice that was missing from the checkout flow, again, we disagree. Unlike the hyperlink on some checkout flow pages, the screenshots suggest the hyperlink in the email is located on a submerged page, requiring the customer to scroll below layers of order summary details, advertisement banners, hyperlinks to "convenient account management services," several logos for Provide's "Family of Brands," and customer service contact information to finally find a reference to "Terms" printed in grey typeface on a white background. This is not the sort of conspicuous alert that can be expected to put a reasonably prudent Internet consumer on notice to investigate whether disputes related to his order will be subject to binding arbitration.

While the lack of conspicuousness resolves the instant matter, we agree with the *Nguyen* court that, to establish the enforceability of a browsewrap agreement, a textual notice should be required to advise consumers that continued use of a website will constitute the consumer's agreement to be bound by the website's terms of use. (See *Nguyen, supra,* 763 F.3d at pp. 1178-1179.) In our view, the problem with merely displaying a hyperlink in a prominent or conspicuous place is that, without notifying consumers that the linked page contains binding contractual terms, the phrase "terms of use" may have no meaning or a different meaning to a large segment of the Internet-using public. In other words, a conspicuous "terms of use" hyperlink may not be enough to

alert a reasonably prudent Internet consumer to click the hyperlink.[5] As the *Nguyen* court observed, "[w]hile failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract, [citation], the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the *breadth of the range of technological savvy of online purchasers*, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." (*Id.* at p. 1179, italics added.) Though we need not resolve the issue here given the inconspicuousness of the Terms of Use hyperlinks on the ProFlowers.com website, in our view the bright line rule established by *Nguyen* is necessary to ensure that Internet consumers are on inquiry notice of a browsewrap agreement's terms, regardless of each consumer's degree of technological savvy. Online retailers would be well-advised to include a conspicuous textual notice with their terms of use hyperlinks going forward.

C.      *Plaintiff Did Not Agree to the Venue Provision Either*

In the alternative, Provide argues the trial court erred by denying its request to transfer venue to San Diego pursuant to a forum selection clause in the Terms of Use. That clause, which is itself presented as an alternative to a class arbitration waiver, provides: "[I]f an arbitrator deems your Waiver of Class Arbitration to be invalid or unenforceable, then . . . you expressly acknowledge and agree that: (ii) all Disputes shall be resolved by a state or federal court located in the county of San Diego, California." The trial court denied the request to transfer venue for the same reason it denied the petition to compel arbitration—namely, because Plaintiff did not agree to the Terms of Use, he did not agree to the forum selection clause contained therein.

---

[5]      Notably, this was not a problem in *Specht* because, although the hyperlink to the subject license agreement was displayed on a submerged portion of the download page, the hyperlink included a notice to " 'Please review and agree to the terms of the Netscape SmartDownload software license agreement before downloading and using the software.' " (*Specht, supra,* 306 F.3d at p. 23.)

14

Provide argues the trial court's reasoning was flawed, because forum selection clauses are presumptively valid. Thus, Provide maintains, though it had the burden to establish an enforceable arbitration agreement, "the presumption in favor of [forum selection clause] enforcement shift[ed] the burden to [Plaintiff] . . . to show why the provision should not be enforced." Insofar as Plaintiff "fail[ed] to establish the unenforceability of the venue provision" in his opposition papers, Provide argues the trial court was required to enforce the provision and transfer the action to San Diego. We disagree.

Provide's reliance on the presumptive validity of forum selection clauses *in otherwise enforceable contracts* proves too much. Contrary to Provide's implicit premise, the presumption of validity is not a substitute for proof of the resisting party's objective manifestation of assent to the larger contract. If it were, a party would establish the existence of a binding contract simply by showing that the contract contained a presumptively valid forum selection clause—an obviously absurd result. The trial court was correct; because Plaintiff was not bound by Provide's Terms of Use, he also could not have been bound by the forum selection clause contained therein.

**DISPOSITION**

The order is affirmed.  Plaintiff Brett Long is entitled to his costs.


**CERTIFIED FOR PUBLICATION**



JONES, J.[*]

We concur:



ALDRICH, Acting P. J.



LAVIN, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16