Filed 1/20/23  Honor Finance v. Spireon CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HONOR FINANCE, LLC, et al. | |
| Plaintiffs and Respondents, | G061171 |
| v. | (Super. Ct. No. 30-2021-01178346) |
| SPIREON, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Derek W. Hunt, Judge.  Reversed and remanded as directed.

Ford & Harrison, Daniel B. Chammas and Min K. Kim for Defendant and Appellant.

Raines, Feldman, Kathy Bazoian Phelps, Robert M. Shore, Camilla Y. Chan; Rachlis Duff & Peel, Drew G.A. Peel and Michael Rachlis for Plaintiffs and Respondents.

\*          \*          \*

Defendant Spireon, Inc. (Spireon) claimed plaintiff Honor Finance, LLC, et al. (the Company) agreed to arbitrate certain disputes when it accepted various terms and conditions prior to purchasing products over the Internet. The Company disputed it had entered into any such agreement. The trial court denied Spireon's motion to compel arbitration (the arbitration motion) on grounds Spireon had failed to produce an arbitration agreement signed by both parties. We find the court misapplied the applicable law governing contract formation over the Internet. Parties are not required to sign an agreement for it to be binding. In Internet transactions, assent to a contract is typically manifested through a party's conduct. Given the novelty of this area of law, the court's error is understandable.[1] But due to this legal error, we reverse the court's order and remand this case as directed.

I

FACTS AND PROCEDURAL HISTORY

*A. The Complaint*

The plaintiffs in this lawsuit are the Company and its parent entity, Honor Finance Holdings, LLC (Holdings). The Company was formed in July 2011 to acquire part of a subprime automobile loan portfolio from an unrelated but similarly named company called Honor Finance Corporation (HFC). The acquisition was completed in October 2011. Holdings was formed in September 2011 and was the sole member of the Company. Spireon is a Tennessee corporation that sells global positioning system (GPS)

---

[1] There appear to be only three published California cases relating to the acceptance of terms and conditions over the Internet: *Long v. Provide Commerce, Inc.* (2016) 245 Cal.App.4th 855 (*Long*), *Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444 (*Sellers*), and *B.D. v. Blizzard Entertainment, Inc.* (2022) 76 Cal.App.5th 931 (*Blizzard*). Of these three cases, *Sellers* was published only a few days before the order at issue while *Blizzard* was published over a year later.

products for the installation in and the tracking of vehicles. Its principal place of business is in Irvine.

Plaintiffs filed this lawsuit against Spireon in January 2021. Generally, plaintiffs alleged Spireon was involved in an illicit scheme with nonparty Robert DiMeo, who was an officer at HFC. After the Company acquired HFC's loan portfolio, DiMeo became a vice president and the chief operating officer for the Company. He remained employed by the Company until 2018, when his fraudulent activity was uncovered.

The alleged illicit scheme involved GPS devices, which the Company sold to its borrowers for purposes of tracking and repossessing vehicles if the borrower defaulted. Plaintiffs alleged that between January 2012 and December 2015, DiMeo purchased over 30,000 GPS devices directly from Spireon for roughly $2.3 million using his personal credit card. DiMeo instructed Spireon to invoice a sham company he owned, LHS Solutions, Ltd. (LHS). DiMeo then caused LHS to invoice the Company for the GPS devices at a substantial mark up over the amount that DiMeo had paid Spireon. After receiving payment from the Company, LHS reimbursed DiMeo for his credit card charges and kicked back the profits to DiMeo and his collaborators. One of his collaborators was Michael Walsh, an accountant who performed services for entities controlled by DiMeo.[2]

The complaint included e-mail orders made directly from DiMeo to Spireon. It also attached internal Spireon e-mails from 2012 showing that DiMeo requested that "Honor Finance" be removed from Spireon's invoices because he "want[ed] no paper trails whatsoever with the name Honor Finance. The goal [was] to

---

[2] In May 2020, an indictment was filed against DiMeo and Walsh in the Northern District of Illinois relating to this alleged scheme. They were both charged with 10 counts of mail fraud. (18 U.S.C. § 1341.) Walsh accepted a plea agreement. The status of DiMeo's criminal case is unclear from the record.

have Honor Finance not be liable for anything [so] the name [was] change[d] on the bill to [LHS]."

The Company discovered DiMeo's alleged scheme in May 2018, and immediately terminated him. However, the Company lost substantial sums of money due to the scheme, among other factors, and ceased operations in September 2018. Holdings lost a $25 million equity investment in the Company. Based on the above allegations, plaintiffs asserted four causes of action against Spireon: (1) aiding and abetting DiMeo's breaches of fiduciary duty, (2) conspiring with DiMeo to defraud the Company, (3) unfair competition under Business and Professions Code section 17200, et seq., and (4) unjust enrichment.

## B. *The Inconvenient Forum Motion*

In March 2021, Spireon filed a motion to dismiss or stay the action on grounds of inconvenient forum (the inconvenient forum motion). It argued the Company and Spireon had entered into a subscription services agreement (SSA), which contained a forum selection clause requiring plaintiffs' claims to be litigated in Tennessee. The inconvenient forum motion explained the Company had accepted the SSA's terms over the Internet. Specifically, an unnamed representative of the Company had logged onto Spireon's Web site on February 4, 2010. The representative was presented with the SSA's terms, which he or she purportedly clicked to accept. Unidentified representatives of the Company subsequently accepted new versions of the SSA over the Internet from 2012 to 2020.

In support of the inconvenient forum motion, Spireon provided copies of all versions of the SSA allegedly accepted by the Company. It also provided a spreadsheet logging each of the Company's purported acceptances of the SSA, which included the user's Internet Protocol (IP) address when accepting the SSA, the date the SSA was

4

accepted, and the SSA version accepted (the SysDevX spreadsheet).[3] Although Holdings had not accepted the SSA's terms, Spireon claimed it was closely related to the Company and should also be bound.

Plaintiffs' opposition claimed no enforceable agreement existed. They pointed out that Spireon claimed the initial SSA had been accepted by the Company in 2010, but the Company did not exist at that time (it was formed in 2011). Further, plaintiffs submitted a declaration from a forensics expert showing none of the IP addresses listed on the SysDevX spreadsheet could be conclusively linked to the Company. The expert declaration also opined Spireon's representation that the Company had accepted the terms of a SSA was "unsupported, forensically unsound, and ambiguous." Finally, to the extent Spireon claimed DiMeo had accepted the terms of the SSA, plaintiffs submitted evidence that he had not been authorized by the Company to do so.

The trial court, Judge Stephanie George presiding, denied the inconvenient forum motion on grounds Spireon had failed to show a valid agreement between the parties. Spireon then filed a petition for a writ of mandate in this Court, which we denied on August 5, 2021.

## C. The Motion to Compel Arbitration

A few days after this Court denied Spireon's petition for a writ of mandate, Spireon filed the arbitration motion, which was also based on the Company's purported

---

[3] "An IP address . . . is a "'unique identifier'" that functions "'much like [a] Social Security number[ ] or telephone number[ ],'" each corresponding to "'a specific entity connected to the Internet.'"" (*Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1273.) """The IP . . . address is unique to a specific computer. Only one computer would be assigned a particular IP address.""" (*People v. Stipo* (2011) 195 Cal.App.4th 664, 673.) As explained below, SysDevX was the name of the system Spireon used for a time to manage customer information.

5

acceptance of the SSA's terms. The arbitration motion was primarily supported by a declaration from Michael Callinan, a senior manager of software development at Spireon.

The arbitration motion and supporting evidence explained that since 2010, all buyers of Spireon's GPS devices are required to accept the SSA's terms in order make purchases. Specifically, in 2010, Spireon used a system known as SysDevX that managed customer orders, billing information, and customer account information. Every customer was assigned a unique identification number. Under SysDevX, each customer could only have one user to log in to the system and place orders. The user had to provide an individual name and e-mail address to sign up. The first time a user logged into SysDevX, he or she had to accept the terms of the SSA to proceed any further. Every time the SSA was updated, SysDevX required the user to agree to the new version of the SSA upon logging in. Users were permitted to review the terms of the SSA before accepting them but were not required to do so. SysDevX tracked user acceptances of the various SSA versions, including the user's IP address, the version of the SSA accepted, and the date and time of acceptance.

Callinan's declaration averred that "SysDevX has a record of an 'Honor Finance' entity as a customer in June 2009." The Company name is listed as "'Honor Finance,'" and the associated username for the account was "Gary Little." In May 2011, the username was changed to "Rob Dimeo." On January 13, 2016, the Company name was changed from "'Honor Finance' to 'Honor Finance LLC.'" Callinan's declaration again attached the SysDevX spreadsheet to show that users of the "Honor Finance" account had accepted various versions of the SSA seven times between February 4, 2010, and October 8, 2014.

The arbitration motion further explained that from October 2014 to May 2015, Spireon migrated the "Honor Finance" account from SysDevX to a new platform called NSpire Internet of Things (NSpire), which also tracked customer information. NSpire allowed customers to authorize multiple unique users to log in to Spireon's

6

system and place orders. A user needed to provide a name and e-mail address to become an authorized user on NSpire. At the time the Company's account was migrated to NSpire, the last acceptance of the SSA was version 4.2 from SysDevX user "'Rob Dimeo'" on October 8, 2014.

Like SysDevX, every time the SSA was updated, NSpire required users to agree to the new version when logging in. Users were permitted but not required to review the SSA before accepting its terms. Information relating to a user's acceptance of an SSA version was stored in NSpire, including the username, the user's IP address, the user's e-mail address, the date of acceptance, and the version of the SSA accepted. Callinan's declaration attached a list of the "Honor Finance" account's authorized users on NSpire (the NSpire user list). It also included a spreadsheet showing all the instances a user associated with the "Honor Finance" account had accepted a version of the SSA (the NSpire spreadsheet). The NSpire spreadsheet showed 45 different users with Honor Finance e-mail accounts accepted a version of the SSA 81 times between May 5, 2015 and January 14, 2016.

Spireon's arbitration motion focused on two users that had purportedly accepted multiple versions of the SSA on behalf of the Company. The first was DiMeo. The second was Kurt Koeckritz, who supposedly accepted the SSA's terms on October 16, 2015, and December 4, 2015. Spireon submitted a copy of Koeckritz's LinkedIn profile via a request for judicial notice, which stated he worked for "Honor Finance" as an Assistant Vice President between April 2010 and May 2018.

Plaintiffs' opposition and supporting evidence argued Spireon had failed to show the Company had accepted any version of the SSA. To begin, they argued Callinan's declaration lacked foundation. Plaintiffs also asserted that prior to January 13, 2016, when the account name changed to "Honor Finance LLC," the "Honor Finance" account referred to HFC and/or LHS, not the Company. Among other things, the "Honor Finance" account was created in SysDevX in June 2009, two years before the Company

7

was formed. Evidence indicated HFC purchased GPS devices from Spireon until at least October 2011, and that HFC continued operations after October 2011. Further, there was evidence HFC personnel used "honorfinance.com" e-mail addresses. Plaintiffs also presented evidence from which it could be inferred that the "Honor Finance" account was associated with LHS, not the Company, from October 2011 until January 2016.

As to the SysDevX spreadsheet, plaintiffs' expert again stated that of the seven acceptances logged, the associated IP addresses did not show a conclusive link to the Company. The expert likewise opined the NSpire spreadsheet was unreliable. Among other things, the names listed on it did not match the NSpire user list. Further, the NSpire spreadsheet showed the Company's users accepted versions of the SSA in 2020 and 2021, years after the Company had suspended business operations. Further, several persons who accepted versions of the SSA did not have "honorfinance.com" e-mail addresses and had no clear association with the Company.

Moreover, plaintiffs asserted Spireon's evidence failed to establish that any NSpire or SysDevX user was authorized to bind the Company to an SSA. They submitted evidence showing DiMeo lacked authority to enter into the SSAs on behalf of the Company, and the Company had not ratified any SSAs he purportedly accepted. Further, it was unclear whether DiMeo had actually accepted the SSA's terms himself. Plaintiffs noted that Spireon's records from SysDevX list the e-mail address for user "Rob Dimeo" as an e-mail address that appears to belong to Walsh, DiMeo's coconspirator. Walsh does not appear to have ever been employed by the Company. Further, there was evidence linking the street address listed for user "Rob Dimeo" in SysDevX to "Michael Walsh & Associates." Likewise, on the NSpire spreadsheet, some of the entries for user "Rob Dimeo" list an e-mail address that again appears to belong to Walsh. As for Koeckritz, plaintiffs argued that while the trial court could take judicial notice of the existence of his LinkedIn profile, it could not accept the truth of that document's contents.

8

Similarly, plaintiffs maintained there was no evidence showing any NSpire or SysDevX user intended to bind the Company when it accepted the terms of the SSA. There was no evidence showing users knew they were accepting the SSA's terms on behalf of the Company rather than individually. Among other things, the SSA stated the parties entering the agreement were Spireon and "you," which plaintiffs argued was ambiguous. They also cited language within certain SSA's suggesting "you" only referred to the individual user.

Spireon filed a reply brief, but it mainly reiterated the points made in the arbitration motion.[4]

The arbitration motion was not heard by Judge George. Rather, it was heard by Judge Derek W. Hunt, who denied the arbitration motion on grounds the parties had not shown a valid agreement was formed. The trial court issued a brief, single paragraph order explaining, "[t]here was no signature by either side put before the court —not even an electronic or digital signature."

Spireon appeals the order denying the arbitration motion. It also requests that we review the trial court's denial of the inconvenient forum motion per the discretionary authority granted in Code of Civil Procedure section 1294.2.

## II

## DISCUSSION

It appears the trial court may have misunderstood the relevant law. Specifically, it was unaware of the various ways contracts can be formed over the Internet. As Internet contract formation is a relatively new area of law, the court's error

---

[4] With its reply brief, Spireon submitted a declaration from Konstantin Bereznyakov, a senior information consultant at Spireon. The Bereznyakov declaration primarily repeats the information in the Callinan declaration but provides more foundation for Bereznyakov's statements.

9

is understandable. But we must reverse the order and remand this case so the court can weigh the evidence above in the first instance under the correct legal principles.

The trial court denied the arbitration motion because "[t]here was no signature by either side put before the court." In support, it cited *Fuentes v. TMCSF, Inc.* (2018) 26 Cal.App.5th 541, and *Flores v. Nature's Best Distribution, LLC* (2016) 7 Cal.App.5th 1, for the proposition that the moving party's (i.e., Spireon) lack of a signature on an arbitration agreement is grounds for denying a motion to compel arbitration. Similarly, the court's questions at oral argument focused on the identities of the persons who had signed the SSA for *both* Spireon and the Company.[5] However, as explained below, Spireon did not have to show a signature from either party to establish a valid arbitration agreement.

"'Under "both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate."' [Citation.] This threshold inquiry stems from the "'basic premise that arbitration is consensual in nature."'" (*Long*, *supra*, 245 Cal.App.4th at p. 861.) A signed arbitration agreement is one manner of manifesting consent. (See *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 850.) But it is not the only manner. "'[I]t is not the presence or absence of a *signature* [on an agreement] which is dispositive; it is the presence or absence of evidence of an *agreement* to arbitrate which matters.' [Citation.] Evidence confirming the existence of an agreement to arbitrate, despite an unsigned agreement, can be based, for example, on 'conduct from which one could imply either ratification or implied acceptance of such a provision.'" (*Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 176.) For example, "[w]hen an employee continues his or her employment after notification that an agreement to arbitration is a condition of continued

---

[5] We note that the trial court suggested clicking to accept an agreement would constitute an electronic signature. But, as explained below, an agreement can be formed over the Internet by means other than a clicked acceptance of offered terms.

10

employment, that employee has impliedly consented to the arbitration agreement." (*Diaz v. Sohnen Enterprises* (2019) 34 Cal.App.5th 126, 130.)

"While Internet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that "'[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.'" [Citation.] ""Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings."""" (*Long*, *supra*, 245 Cal.App.4th at p. 862.) Assent to a contract over the Internet is generally manifested by a user's conduct rather than an electronic signature. "[I]f a website offers contractual terms to those who use the site, and a user engages in *conduct* that manifests her acceptance of those terms, an enforceable agreement can be formed." (*Berman v. Freedom Fin. Network, LLC* (9th Cir. 2022) 30 F.4th 849, 855-856 [applying California law], italics added.)

Absent a showing of actual notice, "a manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons—but any such action must indicate the parties' assent to the *same thing*, which occurs only when the website puts the consumer on constructive notice of the contractual terms." (See *Sellers*, *supra*, 73 Cal.App.5th at p. 461; *Berman v. Freedom Fin. Network, LLC*, *supra*, 30 F.4th at pp. 855-856.) "'[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.'" (*Long*, *supra*, 245 Cal.App.4th at p. 862.) "Thus, in order to establish mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms . . . ." (See *Sellers*, at p. 461.)

11

"Most courts now have identified at least four types of internet contract formation, most easily defined by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." (*Sellers*, *supra*, 73 Cal.App.5th at p. 463.) "'A "*browsewrap*" agreement is one in which an internet user accepts a website's terms of use merely by browsing the site. A "*clickwrap*" agreement is one in which an internet user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available. A "*scrollwrap*" agreement is like a "clickwrap," but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the "I agree" or "I accept" button. . . . "*Sign-in-wrap*" agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up.'" (*Id*. at pp. 463-464.)

Of these four types of agreements, browsewrap agreements are generally unenforceable, clickwrap agreements are normally enforceable, and scrollwrap agreements are consistently found to be enforceable. (*Sellers*, *supra*, 73 Cal.App.5th at p. 470.) "Sign-in wrap agreements fall somewhere in the middle of the two extremes of browsewrap and scrollwrap agreements." (*Id*. at p. 471.) The enforceability of a sign-in wrap agreement generally depends on the nature of the transaction and the conspicuousness of the notice given to the user. (See, e.g., *id*. at pp. 480-482 [finding sign-in wrap agreement unenforceable]; *Blizzard*, *supra*, 76 Cal.App.5th at pp. 949-954 [finding sign-in wrap agreement enforceable].) Whether notice is sufficient must be evaluated within "'the full context of the transaction.'" (*Id.* at p. 950.)

Here, the trial court erred by focusing on whether persons associated with the Company and Spireon had signed the SSA. As explained above, such signatures are unnecessary. Instead of a signature, Spireon could prove assent by showing it presented

12

the SSA's terms to an authorized agent of the Company, the agent was given sufficient notice of those terms, and then accepted them through his or her conduct. (See *Sellers*, *supra*, 73 Cal.App.5th at p. 461; *Berman*, *supra*, 30 F.4th at pp. 855-856; *Mannion v. Campbell Soup Co.* (1966) 243 Cal.App.2d 317, 320 [a company is bound if its agent had authority to contract on its behalf].) Manifestation of assent could be demonstrated by the agent clicking acceptance of those terms, agreeing to the terms as a condition of creating an account, accepting terms to sign into an account, or other conduct. (See, e.g., *Blizzard*, *supra*, 76 Cal.App.5th at pp. 949-954; *Cordas v. Uber Tech., Inc.* (N.D.Cal. 2017) 228 F.Supp.3d 985, 990-991 [finding valid sign-in wrap agreement].) Based on our review of the record, the trial court did not perform this analysis. Specifically, it did not consider whether an agent of the Company had assented to the SSA's terms through his or her conduct, nor did it determine whether Spireon provided sufficient notice of those terms.

We cannot decide these issues on appeal as they involve numerous questions of fact (as seen in the recitation of facts above), which the trial court never resolved. As such, we reverse and remand to the trial court to determine the issues set forth in this opinion in the first instance, as well as any other related arbitration issues that arise.[6] (See, e.g., *Hopkins v. Kedzierski* (2014) 225 Cal.App.4th 736, 756 [matter remanded to allow trial court to make factual findings on previously undecided issue].) Because the arbitration motion must still be resolved by the court, we do not address Spireon's request to revisit the ruling on the inconvenient forum motion.

---

[6] Because the trial court applied the wrong legal standard, it never addressed any of the parties' respective evidentiary objections. We express no opinion as these objections. The court shall consider any evidentiary objections when evaluating the evidence on remand.

13

III

DISPOSITION

The trial court's order is reversed. On remand, the court is directed to review the evidence submitted by the parties and make findings as to several issues. First, it should determine whether an agent of the Company manifested assent to the terms of the SSA. If so, the court must decide whether the terms of the SSA were sufficiently conspicuous to provide constructive notice to that user. (*Long*, *supra*, 245 Cal.App.4th at p. 862; see, e.g., *Sellers*, *supra*, 73 Cal.App.5th at pp. 477-484; *Blizzard*, *supra*, 76 Cal.App.5th at pp. 949-954.) If they were, then the court must review whether the user that accepted the SSA did so on behalf of the Company (as opposed to accepting in his or her individual capacity), and, if so, whether the user had authority to do so. We stress that Spireon need only show that one authorized agent of the Company accepted the version of the SSA it believes governs the transactions at issue. Should the court determine a valid arbitration agreement exists, it must then address any other arguments by the parties as to arbitrability or enforceability. The court, in its discretion, may allow the parties to submit supplemental briefing and evidence to address any of the above issues on remand. Each party shall bear their own costs on this appeal. (Cal. Rules of Court, rule 8.278.)


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


DELANEY, J.

14