Filed 9/28/22; certified for publication 10/18/22 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| SUSAN COSTA, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ROAD RUNNER SPORTS, INC., et al., <br><br> Defendants and Appellants. | D079393 <br><br><br><br> (Super. Ct. No. 37-2020-00017100-CU-MC-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge. Affirmed.

The Weitz Law Office and Michael Weitz for Defendants and Appellants.

Blood Hearst & O'Reardon, Timothy G. Blood, Leslie E. Hurst, Thomas J. O'Reardon II, Jennifer L. MacPherson; Johnson Fistel, Frank J. Johnson and Chase M. Stern for Plaintiff and Respondent.

## INTRODUCTION

Michael O'Connor signed up for a loyalty program when he bought a pair of shoes and socks from Road Runner Sports, Inc. and Road Runner Sports Retail, Inc. (collectively, "Road Runner"). He alleges Road Runner did

not tell him the loyalty program was an automatic renewal subscription and that his credit card would be charged an annual subscription fee. After discovering he had been charged for four years of subscription fees, he joined as the named plaintiff in a class action lawsuit alleging Road Runner had violated California's Automatic Renewal Law and consumer protection statutes.[1]

Road Runner asserts O'Connor is bound by an arbitration provision it added to the online terms and conditions of the loyalty program, some three years after he enrolled. Although Road Runner concedes O'Connor did not have actual or constructive notice of the arbitration provision, it contends O'Connor created an implied-in-fact agreement to arbitrate when he obtained imputed knowledge of the arbitration provision *through his counsel in the course of litigation* and failed to cancel his membership. We disagree this is sufficient under California law to prove consent to or acceptance of an agreement to arbitrate. Accordingly, we affirm the trial court's order denying Road Runner's motion to compel arbitration.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Road Runner's Loyalty Program*[2]

Road Runner is a running shoe and athletic apparel company with more than 35 retail outlets in California and other states, and an online

---

[1]     O'Connor replaced the original named plaintiff, Susan Costa, as the named plaintiff in the First Amended Complaint (FAC), after Costa settled her individual claims with Road Runner.

[2]     The facts regarding the loyalty program, at least as they relate to the motion to compel arbitration, are largely undisputed. Our description of the program is derived primarily from the FAC.

store.  Road Runner offers its customers discounts and rewards through its loyalty program, the "VIP Family Rewards Membership."  It encourages customers to sign up for the loyalty program during the checkout process.  To entice customers, Road Runner offers the loyalty program membership for a marginal amount—just $1.99 as of 2021—and offers a 10% discount and 5% cash back incentive on the customer's first purchase, typically worth more than the membership purchase price.  The customer must have a credit or debit card on file to sign up and, once enrolled, Road Runner automatically charges the customer an annual renewal fee of $39.99, or more, each year.

O'Connor signed up for the loyalty program at a Road Runner retail store sometime in 2016.[3]  O'Connor used his membership to receive a discount on a pair of shoes and socks when he first enrolled.  He used his membership again to receive a discount in 2017.  That was the last time O'Connor used his membership.  Still, Road Runner automatically charged O'Connor's credit card annual subscriptions fees ranging from $27.99 to $39.99 in November of 2017, 2018, 2019, and 2020.  O'Connor paid his credit card bill each time, allegedly without noticing the membership charges.

According to Road Runner, customers like O'Connor who signed up for a membership while making a purchase in a retail store in 2016 would have received a "retail handout[ ]" from the sales associate making the sale.  The

---

[3]     According to Road Runner's Chief Information Officer (CIO), O'Connor had previously enrolled in the loyalty program in 2008, 2010, and 2014.  The record does not disclose whether there were recurring charges associated with those memberships, or whether O'Connor cancelled them.

handout was a trifold pamphlet, and each of the three panels was approximately 5 inches by 7 inches.  One panel looked like this:[4]



TO ENSURE YOU NEVER MISS OUT ON A BENEFIT, YOUR MEMBERSHIP WILL AUTOMATICALLY RENEW EACH YEAR AT $27.99 AND BE CHARGED TO A VALID CREDIT/DEBIT CARD ON FILE (OR AN EXISTING PAYPAL ACCOUNT). YOU MAY CANCEL YOUR MEMBERSHIP AT ANY TIME TO RECEIVE A PRORATED REFUND BY CALLING 800.543.7309.
Benefits and pricing subject to change. Get more info when you visit roadrunnersports.com/vip

---

[4]     Road Runner's CIO attached the entire pamphlet as an exhibit to his declaration and also attached a second image purportedly showing the

At the bottom of that panel, the small print read: "TO ENSURE YOU NEVER MISS OUT ON A BENEFIT, YOUR MEMBERSHIP WILL AUTOMATICALLY RENEW EACH YEAR AT $27.99 AND BE CHARGED TO A VALID CREDIT/DEBIT CARD ON FILE . . . YOU MAY CANCEL YOUR MEMBERSHIP AT ANY TIME TO RECEIVE A PRORATED REFUND BY CALLING 800.543.7309." In smaller print below that, it read: "*Benefits and pricing subject to change. Get more info when you visit* **roadrunnersports.com/vip.**"

Road Runner also sent O'Connor a mailer regarding his membership before each of the renewal charges in 2017, 2018, and 2019.[5] The mailers from 2017 and 2018 were substantially the same. Each had the general appearance of a letter, with a $15 gift certificate at the bottom. The letter portion stated, in relevant part, "YOUR MEMBERSHIP WILL AUTOMATICALLY RENEW TO YOUR CREDIT/DEBIT CARD ON FILE FOR $28.99. REST ASSURED YOU CAN CANCEL YOUR MEMBERSHIP AT ANY TIME . . . BY CALLING 800.255.6422 OR VISITING ROADRUNNERSPORTS.COM/MYACCOUNT."

There was no reference to an arbitration provision, or any other terms and conditions, in the retail handout O'Connor received when he signed up for the loyalty program in 2016, or in the mailers sent to him in 2017 and 2018. That is because the arbitration provision did not exist in those years.

---

"approximate actual size" of the relevant panel. We reproduce the image here in approximately the same size.

[5] Road Runner's CIO attached copies of the "mailer template" for each year to his declaration. He averred the 2018 and 2019 mailers were sent to O'Connor in November of those years, but did not provide a date for the 2017 mailer.

The mailer from 2019 also had the general appearance of a letter, with a notification regarding a $20 "**VIP Anniversary Rewards Gift**" at the bottom. The letter portion stated, in relevant part: "The best part . . . **there's nothing you need to do.** Your new benefits are now live on your account, which will automatically renew 11/25/2019 at the **new annual rate of $39.99**. **See back for additional details.\*\*" Rather than including an actual gift certificate, the bottom half of the mailer sent to O'Connor stated, "**Uh oh! We don't have your email address on file!** [¶] Call us now at 800.543.7309 to add your email address to your account and we'll email you when your $20 Gift is ready."

The back of the 2019 mailer had three separate sections, each with a heading in bold capitalized text. The following text appeared below the second heading: "**YOUR ANNUAL RENEWAL DETAILS**": "YOUR MEMBERSHIP IS SET TO AUTOMATICALLY RENEW BY CHARGING YOUR CREDIT/DEBIT CARD ON FILE . . . UNLESS YOU CANCEL. THE NEW ANNUAL RATE FOR YOUR MEMBERSHIP IS $39.99. YOU MAY CANCEL YOUR MEMBERSHIP AT ANYTIME . . . FOR CANCELLATION . . . CALL 800.543.7309 OR VISIT ROADRUNNERSPORTS.COM/MYACCOUNT."

Included in the 2019 mailer, for the first time, was a reference to terms and conditions of the loyalty program. There was an asterisk (directly below the text we just quoted) that said, in the same small size font as the text but without capital lettering: "*See complete program terms and conditions at roadrunnersports.com/viprewards." Like the previous 2016 to 2018 materials, the 2019 mailer itself did not contain any reference to an arbitration provision.

6

If O'Connor had gone to roadrunnersports.com/viprewards, he would not have been presented with the "complete program terms and conditions," nor would he have easily discovered them. Instead, if he scrolled to the bottom of the referenced webpage, he would find this:[6]

---

[6]    O'Connor's counsel submitted an attorney declaration attaching a screenshot of www.roaderunnersports.com/viprewards as an exhibit, which we reproduce here in approximately the same size and format. But we note the actual size and format may vary based on the device and web browser used to access the website.

Each question could be expanded to reveal the answer and, at the bottom, in the same small print and font as the questions, the webpage stated: "Use of the membership constitutes acceptance of the full terms and conditions of membership. Please review **here**." The word "**here**" was a hyperlink which, if clicked, would take the user to *another* webpage containing the terms and conditions.

The terms and conditions were approximately six pages long. On the final page, in the same size font and typeface as the rest of the terms and conditions, there was a section titled "**Binding Arbitration**." It said: "Any controversy or claim arising out of or relating to this Agreement (including any breach there of) or the Road Runner Sports Rewards Membership shall be settled by arbitration in San Diego County administered by the American Arbitration Association under its Commercial Arbitration Rules. . . . Any such controversy or claim shall be arbitrated on an individual basis and shall not be consolidated with any claim or controversy of any other party."

Road Runner began sending renewal notices by email in 2020. It did not have a valid email address on file for O'Connor, so O'Connor did not receive any notice in 2020 regarding his loyalty program membership, or its automatic renewal.

II.

*Road Runner's Motion to Compel Arbitration*

The class action lawsuit was filed against Road Runner in May 2020, alleging that Road Runner's loyalty program violated the Automatic Renewal Law (Bus. & Prof. Code, §§ 17601–17606) and the Consumer Legal Remedies Act (Civ. Code, § 1750, *et seq*.), by (1) failing to disclose clearly and conspicuously the terms of its automatic renewal membership program before enrolling customers; (2) automatically charging customers renewal fees

8

without first obtaining their affirmative consent; and (3) failing to provide an easy-to-use method for cancellation. (See Bus. & Prof. Code, § 17602, subds. (a)–(c).) Road Runner answered the complaint, generally denying all allegations and asserting 15 affirmative defenses. In its first affirmative defense, Road Runner asserted "the parties agreed to arbitrate this dispute and therefore this matter is not properly before the Superior Court."

In February 2021, O'Connor joined the lawsuit and replaced the original named plaintiff with the filing of the FAC. The FAC included new factual allegations specific to O'Connor, but was otherwise substantially the same as the original complaint. Road Runner answered the FAC, and again asserted arbitration as its first affirmative defense. This time, Road Runner added that "the parties agreed to arbitrate this dispute *under the terms and conditions of the membership, the Plaintiff continues to accept the benefits of the membership at issue without cancellation and with knowledge of the terms and conditions*, and therefore this matter is not properly before the Superior Court." (Italics added.)

Road Runner then moved to compel O'Connor to arbitrate his claims individually. It asserted O'Connor had "demonstrative knowledge" of the loyalty program's online terms and conditions, and the included arbitration provision, because (1) the 2019 mailer "expressly noted terms and conditions applied to the membership and were available online"; (2) "Road Runner pleaded the affirmative defense regarding arbitration and noted the terms and conditions applied"; and (3) "O'Connor's attorneys [had] direct knowledge of the current terms and conditions," as demonstrated by Road Runner's demand for arbitration in the pleadings and the attorneys' own website advertising the class action litigation, which had a link to the terms and conditions. So Road Runner asserted O'Connor had "imputed knowledge" of

9

the arbitration provision through his attorneys, and "implicitly consented" to the arbitration provision by "refus[ing] to cancel" his membership, even after joining the litigation and learning of the arbitration provision.[7]

O'Connor responded he was not bound by the arbitration provision because the online terms and conditions expressly stated a customer would be bound by the *purchase* or *use* of a membership, and he had not purchased or used his membership since 2017. O'Connor further asserted Road Runner failed to prove he unambiguously assented to the arbitration provision, because none of the various pamphlets Road Runner allegedly handed or mailed to him mentioned arbitration. Rather, the inclusion of the arbitration provision in the terms and conditions "hidden deep on one Road Runner webpage" was not sufficient to establish his unambiguous assent. Nor did his alleged failure to cancel his membership establish assent to the arbitration provision; rather, he "went so far as to file a lawsuit to cancel his [m]embership." Finally, O'Connor disputed Road Runner's claim that his knowledge of the arbitration provision could be imputed from his attorneys.[8]

The trial court denied Road Runner's motion to compel arbitration. The court found the evidence demonstrated that O'Connor "was not made aware of the terms and conditions," or any arbitration agreement when he

---

[7] Road Runner also asserted any issues regarding the scope or validity of the arbitration provision, including unconscionability, had been delegated to the arbitrator. The trial court declined to address this argument because it found O'Connor was not bound by the arbitration provision in the first instance. Because we reach the same conclusion as the trial court, we also decline to address this assertion.

[8] O'Connor also asserted Road Runner waived its motion to compel arbitration due to unreasonable delay. The trial court ruled the delay did not constitute a waiver. O'Connor does not challenge that ruling on appeal.

10

signed up for the loyalty program, and the "communications" O'Connor later received from Road Runner "also did not reference or include the terms and conditions or any arbitration provision within those terms and conditions." The court also rejected Road Runner's argument that O'Connor had imputed knowledge of the arbitration provision from his attorneys and implicitly consented to arbitration by refusing to cancel his membership, after joining the litigation. It explained, O'Connor could not accept the terms of an agreement that he was not aware of, and Road Runner cited no authority "for the proposition that knowledge obtained by an attorney during the course of litigation can somehow be imputed to the attorney's client for the period of time predating litigation."

## DISCUSSION

" '[T]he threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate.' " (*Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 460 (*Sellers*).) While both the Federal Arbitration Act (the FAA) and California law favor arbitration, a party is not required to arbitrate his or her claims absent consent.[9] (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97 ["California law, like federal law, favors enforcement of valid arbitration agreements."]; *Sellers,* at pp. 460–461 [" 'a trial court has no power to order parties to arbitrate a

---

[9]    Road Runner asserts the arbitration provision in the loyalty program terms and conditions is governed by the FAA, but the parties agree, general state law principles governing the formation of contracts apply when determining whether an agreement to arbitrate exists in the first instance. (See *Specht v. Netscape Communications Corp.* (2d Cir. 2002) 306 F.3d 17, 26 (*Specht*); *Perry v. Thomas* (1987) 482 U.S. 483, 492, fn. 9 ["state law . . . is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally"].)

11

dispute that they did not agree to arbitrate' "].) The party seeking to compel arbitration " 'bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence.' " (*Sellers,* at p. 462, citing *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972; accord *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*) ["The party seeking arbitration bears the burden of proving the existence of an arbitration agreement[.]"].)

The "determination of whether parties have contractually bound themselves to arbitrate a dispute" is typically a question of law for the courts to decide. (*Specht, supra,* 306 F.3d at p. 26; *Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208 ["the existence of a contract is a question [of law] for the court to decide"].) Where, as here, the relevant underlying facts are largely undisputed, we review the trial court's order denying the motion to compel arbitration de novo. (See *Pinnacle*, *supra*, 55 Cal.4th at p. 236; see also *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60 [appellate court reviews underlying factual findings for substantial evidence].)

On appeal, Road Runner concedes O'Connor did not have actual or constructive notice of the arbitration provision. It relies exclusively on its theory that O'Connor created an implied-in-fact agreement to arbitrate when he obtained imputed knowledge of the arbitration provision *through his counsel in the course of litigation* and still failed to cancel his membership. And it contends the trial court erred by not adequately considering whether O'Connor manifested his assent to the arbitration provision by failing to cancel his loyalty program membership *after joining the lawsuit.* On our de novo review, we conclude Road Runner has failed to meet its burden of proving the existence of a valid arbitration agreement.

12

We begin with Road Runner's assertion O'Connor had imputed knowledge of the arbitration provision through his attorneys. Road Runner devotes all of two short paragraphs to this argument. It relies on the general rule, set forth in Civil Code section 2332, that "both principal and agent are deemed to have notice of whatever either has notice of" and states this general rule of agency applies to the attorney-client relationship. From there, it simply asserts O'Connor's attorneys knew of the terms and conditions and "[t]hat knowledge is imputed by law to . . . O'Connor and therefore [he] indisputably has knowledge of the terms and conditions." Road Runner's argument fails, for three reasons.

First, Road Runner provides no authority, nor are we aware of any, that applies this general agency principle to impute an attorney's knowledge of an arbitration provision to a client for the purpose of compelling arbitration. The sole authority that Road Runner does present, *Chapman College v. Wagener* (1955) 45 Cal.2d 796, is inapposite. The contract at issue in *Chapman College* was a land purchase contract, and the "sole question in dispute" was the buyer's knowledge of "whether certain payments on the [promissory] notes were to be credited solely on principal as claimed by the sellers." (*Id.* at p. 799.) The trial court found there was no mutuality because the chairman of the college board of trustees "believed" the notes provided that all payments would be first credited on interest. (*Id.* at p. 802.) The appellate court reversed. It concluded that because the attorney for the college "helped draft the notes" and "had full knowledge of their provisions," which specified payments would be credited solely on the principal, that knowledge was imputed to the college. (*Ibid.*) *Chapman College* does not stand for the proposition that a client's assent to the *actual formation of a contract* can be based on knowledge imputed from his attorney.

13

Second, an attorney's knowledge is not imputed to a client *before* the formation of the attorney-client relationship. (See *Rosenthal v. Garner* (1983) 142 Cal.App.3d 891, 896 [agent "is under no obligation to communicate any information to the principal" *before* he becomes an agent]; *Triple A Management Co., Inc. v. Frisone* (1999) 69 Cal.App.4th 520, 534 ["The basis for imputing knowledge to the principal is that the agent has a legal duty to disclose information obtained in the course of the agency[.]"]; see also *Pillar Project AG v. Payward Ventures, Inc.* (2021) 64 Cal.App.5th 671, 676 [agent's acceptance of online terms and conditions *prior* to formation of any agency relationship with plaintiff did not bind plaintiff].) Here, O'Connor joined the lawsuit as the named plaintiff in January 2021. Road Runner does not present any evidence O'Connor had any relationship with his attorneys, or the litigation, before that date.[10] And as the trial court put it, Road Runner presents no authority for "the proposition that knowledge obtained by an attorney during the course of litigation can somehow be imputed to the attorney's client for the period of time predating litigation."

Third, even if knowledge of the arbitration clause could be imputed to O'Connor through his attorneys, that is not enough to establish an agreement to arbitrate was formed. Here, the arbitration provision appears only in terms and conditions displayed on the company's website. As this court recently explained, " '[w]hile [i]nternet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that

---

10    Road Runner asserts O'Connor did not provide a declaration, or other evidence, of the date he joined the litigation. But it is Road Runner's burden to prove the existence of a valid agreement to arbitrate, and Road Runner did not provide any evidence O'Connor had imputed knowledge of the arbitration clause before January 2021.

14

" '[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.' " ' " (*Sellers, supra,* 73 Cal.App.5th at p. 460, quoting *Long v. Provide Commerce, Inc.* (2016) 245 Cal.App.4th 855, 862.)  "Mutual assent, or consent, of the parties 'is essential to the existence of a contract.' " (*Sellers,* at p. 460.)  " 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.' " (*Ibid.*)  " 'If there is no evidence establishing a manifestation of assent to the "same thing" by *both* parties, then there is no mutual consent to contract and no contract formation.' " (*Ibid.*, italics added.)

Typically, when an arbitration provision appears only in terms and conditions displayed on the company's website, a consumer manifests his or her assent to be bound by taking some action—such as checking a box or clicking " 'I agree' "—while interacting with the website.  (See *Sellers, supra,* 73 Cal.App.5th at p. 463.)  Here, Road Runner presents no evidence that O'Connor interacted with its website in any way, at any time, including after he purportedly gained imputed knowledge of the arbitration provision through his attorneys.  Instead, Road Runner asserts O'Connor manifested his assent to the arbitration provision by simply "elect[ing] not to call the toll-free telephone number to cancel [his loyalty program] membership." (Boldface omitted.)  This is not sufficient to establish mutual manifestation of assent.

O'Connor took no actions manifesting his assent to be bound by the arbitration provision, including after he joined the litigation.  The loyalty program terms and conditions provided three ways a customer could manifest his or her assent to be bound:  purchasing a membership, using a

15

membership, or renewing a membership.[11] O'Connor first purchased his loyalty program membership in 2016. He last used it in June 2017. And Road Runner last charged him a renewal fee in November 2020. All of these events occurred *before* he joined the lawsuit in January 2021. Thus, even if any of those actions could be sufficient to bind a consumer to the online terms and conditions, they were not sufficient to bind O'Connor to the arbitration provision in this case because none of them occurred *after* O'Connor purportedly obtained imputed knowledge of that provision.

Still, Road Runner argues O'Connor was bound by his *inaction* in failing to cancel his membership *after* he joined the litigation. This argument fails as well. Even if O'Connor had imputed knowledge of the arbitration provision after joining the litigation, he had no reason to believe he would be bound by the terms and conditions simply by failing to call the toll-free number to cancel his membership. As we have just explained, the terms and conditions specified three ways in which a consumer could be bound, and failing to cancel a membership was not one of them.

Further, from the moment O'Connor joined the lawsuit, he and his counsel asserted he was *not* bound by any of the loyalty program terms and conditions, including the arbitration provision, because he never agreed to enroll in an ongoing, automatically renewing membership program in the

---

[11] The terms and conditions stated: "When you *purchase* the Membership *and continue to use it,* you agree to the following terms and conditions"; "*Purchase or use* of a Membership at any time subjects the purchaser and user . . . to the provisions of this Agreement"; and "By *purchasing* your Rewards Membership *or renewal*, you are affirmatively consenting to the terms and conditions of this Agreement." (Italics added.)

16

first place.[12]  Further still, O'Connor *did* try to cancel his membership.  He joined the lawsuit as the named plaintiff in the FAC, which sought, among other relief, a judicial determination that Road Runner's loyalty program was unlawful, and an injunction preventing Road Runner from continuing to charge consumers like him renewal fees.  And his attorneys sent at least two letters to Road Runner; one demanding that Road Runner cease the loyalty program altogether, and a second demanding Road Runner cancel O'Connor's individual membership.

O'Connor's counsel sent the first demand letter to Road Runner in May 2020, before filing the initial complaint.  The letter stated "we hereby demand on behalf of our client *and all others similarly situated* that [Road Runner] immediately . . . ceas[e] the misleading marketing campaign, ceas[e] dissemination of false and misleading information as described in the enclosed Complaint, and initiat[e] a corrective advertising campaign to reeducate consumers regarding the truth of the products at issue.  In addition, Road Runner *must offer to refund* the annual renewal fee charged *to all consumer purchasers* of its VIP Family Membership programs."  (Italics added.)  These demands applied to O'Connor as a "similarly situated" consumer.  By seeking reimbursement of those fees, and cessation of the marketing campaign, the letter effectively sought to cancel the loyalty program memberships of all consumers enrolled in the loyalty program,

---

12     We express no opinion as to whether Road Runner provided adequate notice of the automatic renewal as required by California law, one of the primary disputed issues in the underlying litigation.  Road Runner asserts O'Connor failed to provide a declaration supporting his allegation that he was not aware of the renewal charges when he paid them.  This fact does not change our analysis.  It is undisputed that O'Connor had knowledge of the renewal fees by the time he joined the lawsuit.

including O'Connor. The letter was also attached, as Exhibit A, to the original complaint and the FAC. And once O'Connor joined the lawsuit, he explicitly joined the ongoing demands that Road Runner cease the loyalty membership program altogether.

O'Connor's attorneys sent a second letter to Road Runner in April 2021, shortly after Road Runner filed its motion to compel arbitration. The letter, "again demand[ed] that Road Runner Sports cancel the current year VIP membership it claims it is entitled to renew automatically and cease to renew it in the future." The letter stated, further, "[a]s you know, Mr. O'Connor was unaware of any automatic renewal of his [loyalty program] membership and has sought to cancel it, including by bringing this lawsuit against Road Runner seeking cancellation." Road Runner refused to cancel O'Connor's membership. Its attorney responded, in part, "[y]ou and Mr. O'Connor are aware of how to cancel the membership. Sending a letter to me is not one of the prescribed methods."

Despite Road Runner's refusal to comply with O'Connor's requests, O'Connor undoubtedly manifested his intent to cancel his membership. Viewed in context of these affirmative attempts to *reject* the membership, O'Connor's failure to use Road Runner's preferred method to cancel the *very same* membership cannot be viewed as an objective outward manifestation of assent *to be bound* by the associated terms and conditions.[13] O'Connor's

---

[13]   It is not apparent from the record before us why O'Connor did not call the toll-free number to cancel his membership. But, according to the customer complaints set forth in the initial complaint and the FAC, Road Runner routinely failed to acknowledge customer requests to cancel loyalty program memberships even when they did so by calling the toll-free number.

18

conduct after joining the lawsuit does not establish the assent necessary to the formation of an agreement to arbitrate.

Road Runner relies on two cases to assert a party may be bound by an implied-in-fact agreement to arbitrate based on a failure to deviate from a prior course of conduct. Neither case helps Road Runner's position. In the first, the court found an employee was bound by an arbitration provision in the company's "Dispute Resolution Program," because the employee *continued to work* for the company after receiving a memorandum expressly stating the program would govern "all future legal disputes between you and the Company that are related in any way to your employment." (*Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 419.) By contrast here, O'Connor did not take any affirmative action—such as continuing to work for a company—manifesting his intent to be bound by the arbitration provision. Rather, O'Connor objectively manifested an intent to *cancel* his membership and, thus, *not* to be bound by any associated terms and conditions.

The second case Road Runner relies on is an Alabama case applying Alabama law. (See *Memberworks, Inc. v. Yance* (2004) 899 So.2d 940.) It is not binding on this court, nor is it persuasive. The plaintiff there affirmatively agreed to enroll in a discount membership over the phone *after* the operator told him Memberworks would charge him $7 a month billed annually if he did not cancel in the first 30 days. (*Id.* at p. 941.) Memberworks then sent the plaintiff a membership kit with a membership agreement that included an arbitration provision. (*Ibid.*) The plaintiff did not cancel his membership and, instead, made two annual payments *after* receiving the kit. (*Id.* at p. 942.) The court found the plaintiff "manifested his assent to abide by the terms of the arbitration agreement of which he

19

received notice *when he joined the program*" by paying the two renewal fees. (*Id.* at p. 943, italics added.)

Here, O'Connor was not presented with an arbitration provision when he joined the program, or before he paid the first two renewal fees, nor does Road Runner rely on the inconspicuous notice of the loyalty program terms and conditions in the 2019 mailer. Road Runner alleges O'Connor manifested his assent to be bound by the arbitration provision by failing to cancel his membership *after* he joined the lawsuit, and *after* he paid the most recent renewal fee. Road Runner presents no authority suggesting a litigant may be bound to an arbitration provision by mere inaction in light of imputed knowledge of the provision through his attorneys.[14] For these reasons, we conclude Road Runner has not met its burden to prove O'Connor manifested his assent to be bound by the arbitration provision.

Road Runner also asserts, to the extent we agree O'Connor is bound by the arbitration provision, any further issues regarding the validity and scope of the arbitration provision must be delegated to the arbitrator. Because we conclude Road Runner has not established the existence of a valid agreement

---

[14] Road Runner cites two additional cases for the proposition that assent can be inferred through inaction where there is a prior relationship or course of dealing between the parties. (See *Southern California Acoustics Co. v. C. V. Holder, Inc.* (1969) 71 Cal.2d 719, 722; *Beatty Safway Scaffold, Inc. v. Skrable* (1960) 180 Cal.App.2d 650, 655.) Both involve an ongoing business relationship between sophisticated parties, and neither addresses whether a consumer can be bound to an arbitration provision in online terms and conditions by failing to cancel an automatically renewing rewards membership.

to arbitrate, we do not need to reach the issue of delegation of arbitrability.[15,16]

DISPOSITION

The order denying Road Runner's motion to compel arbitration is affirmed. O'Connor is awarded his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

AARON, J.

---

[15] O'Connor asks us to take judicial notice of four documents related to the American Arbitration Association's (AAA) rules and procedures and asserts they are relevant to Road Runner's delegation argument. We deny the request as those items are not necessary to the resolution of this appeal. (See *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063; *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)

[16] We conditionally granted a request by Road Runner to file its certificate of interested entities or persons (CIP) under seal while the present appeal was pending. After further consideration by this panel, the CIP may remain sealed. (See Cal. Rules of Court, rule 8.208(d)(2).)

Filed 10/18/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SUSAN COSTA,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROAD RUNNER SPORTS, INC., et al.,<br><br>    Defendants and Appellants. | D079393<br><br><br>(Super. Ct. No. 37-2020-00017100-CU-MC-CTL) |

THE COURT:

The opinion in this case filed September 28, 2022 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

OROURKE, Acting P. J.

Copies to:  All parties