Filed 3/25/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BRINAN WEEKS<br><br>Plaintiff and Respondent,<br><br>v.<br><br>INTERACTIVE LIFE FORMS, LLC,<br><br>Defendant and Appellant. | B323430<br><br>(Los Angeles County<br>Super. Ct. No. 22STCV03531) |

APPEAL from an order of the Superior Court of Los Angeles County, David S. Cunningham III, Judge. Affirmed.

Sullivan Johnson and Daniel A. Johnson for Defendant and Appellant.

Russell Law, L. David Russell; Qureshi Law and Omar G. Qureshi for Plaintiff and Respondent.

———————————

E-commerce websites typically contain terms of use, which can include terms providing for arbitration in the event of disputes.  Sometimes those terms are prominently displayed and require express acknowledgment; other times they can be inconspicuous and never seen by a consumer.  Prior cases hold that so-called "browsewrap" provisions on a website, which deem a consumer to have agreed to the website's terms of use simply by using the website and without taking any affirmative steps to confirm knowledge and acceptance of the terms of use, generally do not form an enforceable agreement to arbitrate under California law.

In seeking to compel arbitration, the website owner in this case asks us to depart from these prior cases and announce a new rule permitting broader enforcement of browsewrap provisions, or alternatively to find that the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.) preempts existing state law adverse to browsewrap provisions.  We find no grounds to deviate from prior precedent and reject the novel FAA preemption claim.

## FACTS AND PROCEEDINGS BELOW

Defendant Interactive Life Forms, LLC (Interactive) operates an online business selling sex toys under the brand name Fleshlight.  Plaintiff Brinan Weeks filed a putative class-action suit against Interactive alleging that the company falsely advertised and misrepresented products sold on its website.  Weeks alleged that he purchased a device called a Stamina Training Unit (STU) from the fleshlight.com website (the website) on or around September 21, 2021, on the basis of Interactive's claims that the device would help him "perform better," "last longer," and "improve [his] sexual stamina." Despite his frequent use of the product over several months,

Weeks alleged "there was no improvement in [his] sexual performance or stamina." Weeks asserted causes of action for negligent misrepresentation, violation of the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.), false advertising, breach of express and implied warranty, and violation of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) on behalf of himself and similarly situated plaintiffs.

Interactive responded by moving to compel arbitration. Interactive alleged that "[e]very page of [its] website contains a hyperlink to the '[t]erms of [u]se' that govern use of the website in the lower right quadrant of the webpage," and that "[t]he [t]erms of [u]se mandate mediation and arbitration of any controversy, claim or dispute related in any way to access to or use of [its] website." The company claimed these terms of use bound customers regardless of whether they clicked on this link, and without the need for any affirmative assent to the terms of use when using the site or buying products from it.

In support of its motion, Interactive included a declaration from one of its employees attaching the website's landing page as of June 9, 2022. The employee attested that the same terms of use had been in effect since January 2020, and that a link to those terms of use was on every page of the website since at least 2012. The landing page exhibit showed, in the bottom right corner, the words "terms of use" (capitalization omitted) in small gray text against a black background. According to Interactive, all pages on the website included similar links to the terms of use.

Interactive attached as another exhibit a printout of the terms of use. The document begins with the following statement: "The terms of use set forth below . . . govern your use of the site

3

via the internet, the world wide web, mobile networks, or any other communication methods now known or in the future developed.  In consideration for access to and/or use of the site, you . . . agree to read the terms carefully before accessing the site, you acknowledge that you have read and understood the terms, and you agree to be bound by the terms.  The terms are a legal contract between you and [Interactive], and govern your access to and/or use of the site."  (Capitalization omitted.)  Later, the document states, "By accessing or otherwise using the site you agree to these terms [and] conditions."  (Capitalization omitted.)

Eleven pages later, in a section under the heading "Dispute Resolution," the document states, "You agree first to try to resolve any controversy, claim, or dispute arising out of or relating to the [t]erms or the access and/or use of the [s]ite, with the help of a mutually agreed upon mediator in Austin, Travis County, Texas. . . .  [¶]  If it proves impossible to arrive at a mutually satisfactory solution through mediation, [y]ou agree to submit the dispute to binding arbitration in Austin, Travis County, Texas.  You agree to arbitrate on an individual basis to resolve disputes rather than jury or any other court proceedings, or class actions of any kind. . . ."  (Capitalization omitted.)

Interactive argued that Weeks impliedly agreed to the terms of use, including the arbitration provision, by using the website to purchase the STU "regardless of any assertion that he did not read the" terms of use.  In Interactive's view, the fact that Weeks filed suit rather than contacting Interactive first for a refund or replacement showed that he was not an ordinary consumer, and this "permits the inference that [Weeks] either had actual knowledge of the arbitration agreement or

4

intentionally avoided reading the [terms of use] so that he could claim ignorance of its arbitration provisions."

In opposing the motion to compel arbitration, Weeks declared that he visited the website from his smartphone, and that he did not navigate to the very bottom of the page before purchasing an STU.  Weeks denied seeing a link to the terms of use and explained that he "did not expect that [his] one-time purchase of a product from the www.fleshlight.com website required [him] to enter into the [t]erms of [u]se or any other agreement."

The trial court denied the motion to compel arbitration, finding that Interactive failed to show the parties agreed to arbitrate their dispute.  The court first questioned whether Interactive's exhibits accurately reflected the contents of the website at the time Weeks purchased the STU, as the employee who purported to authenticate them was on leave around the purchase.  Even if the exhibits did accurately reflect the website's content at the time of Weeks's purchase, the court found Interactive had failed to show that Weeks assented to the terms of use.  The court stated that the link to the terms of use "is tiny, illegible, and inconspicuous," and found that Weeks "never saw it or agreed to any provisions.  The design and content of [Interactive]'s website pages were insufficient to put a reasonable user or [Weeks] on notice of the terms of use and the arbitration agreement."

## STANDARD OF REVIEW

"We review an order denying a motion to compel arbitration based on findings of fact for substantial evidence.  [Citations.]  Where the facts are undisputed, we review the denial of a motion to compel arbitration de novo.  [Citations.]  Likewise,

5

we independently review the order if the trial court's denial rests solely on a question of law.  [Citations.]"  (*Villareal v. LAD-T, LLC* (2022) 84 Cal.App.5th 446, 456.)

## DISCUSSION

### A.    There Was No Agreement to Arbitrate under California Law

In denying the motion to compel arbitration, the trial court relied on three prior decisions finding browsewrap or other similar provisions unenforceable:  *Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 461 (*Sellers*), *Long v. Provide Commerce, Inc.* (2016) 245 Cal.App.4th 855 (*Long*), and *Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171, 1175 (*Nguyen*).  Interactive acknowledges that it cannot demonstrate an agreement to arbitrate under the test set forth in these cases and instead urges us to "revisit and reject" this precedent.[1]  Before turning to the question of whether these cases remain correctly decided, we first explain their reasoning.

"Arbitration under the [FAA] is a matter of consent, not coercion" (*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.* (1989) 489 U.S. 468, 479 [109 S.Ct. 1248, 103 L.Ed.2d 488]), and a court may not compel parties to arbitrate a dispute "when they have not agreed to do so."  (*Id.* at p. 478.)  In determining whether an arbitration agreement exists,

---

[1] Interactive also challenges the trial court's ruling that Interactive failed to introduce competent evidence as to the website's contents at the time Weeks made his purchase.  We need not address that issue because we agree with the trial court's finding there was no agreement to arbitrate even if the website was as Interactive claimed.

6

we apply the same rules of contract formation as for any other contract. (*Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 244.) In particular, " '[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.' " (*Nguyen, supra*, 763 F.3d at p. 1175, quoting *Specht v. Netscape Communications Corp.* (2d Cir. 2002) 306 F.3d 17, 29 (*Specht*).)

On the internet, "a manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons." (*Sellers, supra*, 73 Cal.App.5th at p. 461.) Courts have generally enforced agreements to arbitrate formed via "clickwrap,"[2] where " 'an internet user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available.' " (*Id.* at p. 463.) Clickwrap agreements have been held to manifest assent, even on consumers who did not read them, because "the website [has] put[ ] the consumer on constructive notice of the contractual terms." (*Id.* at p. 461; accord, Lemley, *Terms of Use* (2006) 91 Minn. L. Rev. 459, 466 ["Because the user has 'signed' the contract by clicking 'I agree,' every court to consider the issue has held clickwrap licenses enforceable." (Fns. omitted.)].)

_____

[2] Clickwrap and browsewrap agreements derive their name by analogy from " 'shrink-wrap licenses' " in which companies selling software at brick-and-mortar retailers sought to bind customers to terms of use by placing notice of a license agreement on the software's packaging, though " 'the entire agreement [could] only be viewed after buying the product and breaking through the plastic shrink-wrap packaging.' " (*Sellers, supra*, 73 Cal.App.5th at p. 463.)

Neither party in this case denies that the terms of use on Interactive's website took the form of browsewrap, as Weeks was not required to indicate his assent by clicking a checkbox or taking any other affirmative action.  Browsewrap provisions differ from clickwrap because they operate under the theory that the " 'user accepts a website's terms of use merely by browsing the site.' "  (*Sellers, supra*, 73 Cal.App.5th at p. 463.)  Because browsewrap does not require the user to take any unambiguous action to agree to the terms of use, "courts have reached consistent conclusions when evaluating the enforceability of [these] agreements . . . , generally finding . . . browsewrap agreements to be unenforceable."  (*Id.* at p. 466.)

California law does not categorically state that a contract can never be formed on the basis of browsewrap.  Courts have considered browsewrap under the ordinary standard for inquiry notice, holding that "where . . . there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract."  (*Nguyen, supra*, 763 F.3d at p. 1177.)  In practice, however, the standard a website must meet to place a user on inquiry notice of browsewrap is high.  *Nguyen* set forth a bright line rule that "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice."  (*Id.* at pp. 1178–1179.)

In *Nguyen*, the defendant's website included a " '[T]erms of [U]se' link . . . either directly below the relevant button a user must click on to proceed in the checkout process or just a few inches away.  On some pages, the content of the webpage is compact enough that a user can view the link without scrolling.  On the remaining pages, the hyperlink is close enough to the 'Proceed with Checkout' button that a user would have to bring the link within his field of vision in order to complete his order." (*Id.* at p. 1178.)  The court concluded that, "In light of the lack of controlling authority on point, and in keeping with courts' traditional reluctance to enforce browsewrap agreements against individual consumers" (*ibid.*, fn. omitted), the links were insufficiently prominent to place the plaintiff on constructive notice of the terms of use.  "[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.  Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." (*Id.* at p. 1179.)

The court in *Long* agreed with the Ninth Circuit's analysis in *Nguyen*, and endorsed its bright line rule "that, to establish the enforceability of a browsewrap agreement, a textual notice should be required to advise consumers that continued use of a Web site will constitute the consumer's agreement to be bound by the Web site's terms of use." (*Long, supra*, 245 Cal.App.4th at p. 867, citing *Nguyen, supra*, 763 F.3d at pp. 1178-1179.)  The conclusion that the defendant was not on inquiry notice of the browsewrap agreement was straightforward in *Long* because the hyperlinks to the terms of use were so difficult to find.  (*Long, supra*, 245 Cal.App.4th at p. 863.)  The links were located far at

the bottom of the web page beneath multiple layers of footers and were displayed in a green typeface that "could blend in with the . . . site's lime green background." (*Id.* at p. 866.)

In *Sellers*, the court extended the reasoning of *Long* and *Nguyen* to another form of "*-wrap*" agreement, in this case "sign-in wrap." In this arrangement, " 'a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up.' [Citations.]" (*Sellers, supra,* 73 Cal.App.5th at p. 464.) The plaintiffs in *Sellers* clicked on a button labeled " '[s]tart my trial,' " with the expectation that they would be able to submit a single question for an expert to answer for a one-time fee of $5. (*Id.* at p. 480.) In small print elsewhere on the screen appeared an inconspicuous link to a terms of service document purporting to require consumers to settle their disputes in arbitration. The court concluded that the notice was not "sufficiently conspicuous to put [p]laintiffs on inquiry notice that they would be bound by the terms of service by proceeding with their trial."[3] (*Id.* at p. 481.)

The web design in this case is similar to that in *Long*. The printout of the website's landing page in the appellate record shows that the majority of the page is composed of advertisements for Interactive's products. Near the bottom of the

---

[3] In cases involving websites with more conspicuous notice of the terms of use, courts have enforced arbitration agreements based on sign-in wrap. (See, e.g., *B.D. v. Blizzard Entertainment, Inc.* (2022) 76 Cal.App.5th 931, 949–953.)

page is a section inviting the user to submit his or her email address "to receive our latest news [and] promotions!" Beneath that appears a menu in white text against a dark gray background containing links to portions of the website, as well as links to Interactive's social media profiles and other links. Finally, at the very bottom of the page, in a much smaller typeface, in gray text against a black background, appears a link labeled "terms of use," sandwiched between similar links for the "sitemap" and "privacy policy." (Capitalization omitted.) Our examination of the page leads us to the same observation the court made in *Long*: it is "difficult . . . to find the [t]erms of [u]se hyperlinks . . . *even when one is looking for them*." (*Long, supra*, 245 Cal.App.4th at p. 866, fn. omitted.) And just as in *Long*, we cannot imagine how this tiny, inconspicuous link would put a reasonably prudent consumer on inquiry notice of the terms of use.

In sum, substantial evidence supports the trial court's finding that "[t]he design and content of [Interactive]'s website pages were insufficient to put a reasonable user or [Weeks] on notice of the terms of use and the arbitration agreement."

## B.    We Decline to Depart from *Long* and *Nguyen*

Interactive contends that we should reject the reasoning in *Long* and *Nguyen* as to browsewrap on two grounds. First, it argues that as Internet commerce has become more popular, "users are becoming more familiar with the use of websites generally and the terms and conditions governing use of websites to make online purchases specifically," with the result that "reasonably prudent internet users do not now expect (nor should they expect) that there are *no rules* governing their use of websites" (bold and fn. omitted). Second, Interactive argues that

11

the *Long* and *Nguyen* approach "is facially overinclusive because it expressly applies to entire classes of internet users," including users who are more sophisticated than average and either know or should know of a website's terms of use.

We find neither argument persuasive. Interactive's claim as to consumers' expectations when visiting a website is pure speculation, and "there is very little empirical evidence regarding 'what the average internet user perceives to be the meaning of the phrase "terms of use" or "terms and conditions," or the degree to which he or she is aware that each time a purchase is conducted over the internet, a binding contract regarding more than just the promise to pay may be being entered into.' " (*Sellers*, *supra*, 73 Cal.App.5th at p. 475, quoting *Berkson v. Gogo LLC* (E.D.N.Y. 2015) 97 F.Supp.3d 359, 380.) Indeed, one might just as easily argue that as internet commerce has grown in popularity, consumers have become more accustomed to clickwrap agreements, and might assume that if they do not click a checkbox indicating that they agree to a site's terms of use, they are not bound. We agree with the *Sellers* court that given the uncertainty regarding consumer expectations "it is more appropriate to focus on the providers, which have complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online," including by using methods such as clickwrap, in which a consumer's assent to the terms of use is clearer. (*Sellers*, *supra*, at pp. 475–476.)

Interactive's second argument is similarly unavailing. The bright line rule set forth in *Long* and *Nguyen* provides clear guidance to website owners and is straightforward for courts to apply. Interactive asserts that when considering a claim of

constructive notice, some consumers (such as Weeks) should nevertheless have a greater duty of inquiry than others because of their purported sophistication. We question the factual premise of this argument as framed by Interactive here. Interactive bases its claim of sophistication on Weeks having filed suit rather than first contacting Interactive for a refund or replacement as required by the terms of use, asserting that one can infer from Weeks's actions that he "had actual knowledge of the arbitration agreement or intentionally avoided reading" its terms. This appears to presume that Weeks did in fact see the terms of use or was aware of their existence and deliberately avoided reading them. If Weeks did not see the terms of use (as he declared was the case), his failure to adhere to those terms by filing suit instead of seeking a refund says little by itself about his sophistication. We decline to infer that any consumer who pursues a legal remedy in the first instance must necessarily be so sophisticated we can presume they pored over a website despite their sworn statements to the contrary. Interactive also alleges that Weeks failed to comply with Commercial Code section 2607, subdivision (3)(A), which requires a buyer "within a reasonable time after he or she discovers or should have discovered any breach, [to] notify the seller of breach or be barred from any remedy." Whether Weeks met the statutory requirements for a breach of warranty claim is a matter for the trial court to address in future proceedings, but we do not understand how his alleged failure to comply with those requirements is evidence of his sophistication.

But even if we posit Weeks was more sophisticated than the average consumer, inquiry notice is defined in statute and in case law based on the expectations of "a prudent person" (Civ.

13

Code, § 19) or "a reasonably prudent user" (*Nguyen, supra*, 763 F.3d at p. 1177; accord, *Marina Pacifica Homeowners Assn. v. Southern California Financial Corp.* (2014) 232 Cal.App.4th 494, 511; *California State Auto. Assn. Inter-Insurance Bureau v. Barrett Garages, Inc.* (1967) 257 Cal.App.2d 71, 79; *Specht, supra*, 306 F.3d at p. 30, fn. 14), *not* a hypothetical or actual supremely savvy user. Interactive offers no explanation for why we should, or even could, depart from such well-established law.

Interactive's proposal also contradicts the law's longstanding skepticism of charging parties with knowledge they do not actually possess. "The doctrine of constructive notice has always been regarded as a harsh necessity; and the statutes which create it have always been subjected to the most rigid construction." (*Call v. Hastings* (1853) 3 Cal. 179; accord, *MacGowan v. Jones* (1904) 142 Cal. 593, 595 ["Constructive notice is at the best but a poor substitute for actual notice, and is permitted by the law only through necessity"].) We decline to make it easier to establish contracts without proof that both parties were aware of the terms, as that would undermine " '[m]utual manifestation of assent,' " as " 'the touchstone of contract.' " (*Nguyen, supra*, 763 F.3d at p. 1175, quoting *Specht, supra*, 306 F.3d at p. 29.)

Our rejection of Interactive's argument does not put website operators in an untenable position. Interactive had an opportunity before the trial court to show that Weeks was actually aware of the website's terms of use. (See *Nguyen, supra*, 763 F.3d at p. 1176 ["courts have consistently enforced browsewrap agreements where the user had actual notice of the agreement"].) Alternatively, Interactive could have used clickwrap, so that Weeks would have had to acknowledge that he

14

knew about and agreed to be bound by the terms of service at the time he purchased the product. As the Second Circuit stated in *Specht*, "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." (*Specht, supra*, 306 F.3d at p. 35.) It is not necessary to undermine that principle, or depart from settled precedent, to provide businesses greater protection from technologically savvy users.

## C.     The FAA Does Not Preempt California Law on Browsewrap Agreements

Interactive further claims that the FAA preempts California law concerning browsewrap provisions. We now make express what was implicit in prior cases: the FAA does no such thing.

The FAA ordinarily defers to state law on questions of contract formation, unless state law fails "to place arbitration agreements 'on equal footing with all other contracts.'" (*Kindred Nursing Centers Ltd. Partnership v. Clark* (2017) 581 U.S. 246, 248 [137 S.Ct. 1421, 197 L.Ed.2d 806] (*Kindred*), quoting *DIRECTV, Inc. v. Imburgia* (2015) 577 U.S. 47, 54 [136 S.Ct. 463, 193 L.Ed.2d 365].) To the extent a state law discriminates against arbitration, however, either on its face or "by disfavoring contracts that . . . have the defining features of arbitration agreements," state law is preempted. (*Kindred, supra*, at p. 251.)

California law regarding consumer Internet contract formation does not single out arbitration agreements, but instead applies equally to all contractual provisions. In addition, several cases cited above—*Nguyen*, *Long*, *Specht*, and *Sellers*—have applied California law regarding browsewrap formation to

motions to compel arbitration under the FAA without any suggestion of possible preemption.

Nevertheless, Interactive argues that state law on browsewrap agreements is preempted because the enforcement of such agreements "is most likely to arise in the context of efforts to compel arbitration." Interactive claims it has been "unable to locate any reported appellate decision applying California law addressing the formation of internet browsewrap arbitration agreements outside the arbitration context." Thus, in Interactive's view, even if California law is facially neutral, it "has a 'disproportionate impact on arbitration.' [Citation.]" (*Chamber of Commerce of the USA v. Bonta* (9th Cir. 2023) 62 F.4th 473, 483.)

We are not persuaded. When deciding whether a law is preempted by the FAA, the Supreme Court has not been guided primarily by how often the law is applied in arbitration contexts as opposed to others, but rather by whether the law "interferes with fundamental attributes of arbitration" (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 344 [131 S.Ct. 1740, 179 L.Ed.2d 742] (*Concepcion*)) or "singles out arbitration agreements for disfavored treatment." (*Kindred*, *supra*, 581 U.S. at p. 248). In *Concepcion*, the court addressed California law barring as unconscionable waivers of class-wide proceedings in consumer contracts. The law did not on its face discriminate against arbitration, in that it simply provided all plaintiffs, whether in litigation or arbitration, the right to demand that their cases be decided on a class-wide basis. (*Concepcion*, *supra*, at p. 347.) The court nevertheless held that the law was preempted because class-wide proceedings would "sacrifice[ ] the principal advantage of arbitration—its informality—and make[ ] the process slower,

16

more costly, and more likely to generate procedural morass than final judgment." (*Id.* at p. 348.)

Similarly, in *Kindred*, the court held that the FAA preempted a Kentucky court's decision barring agents granted a power of attorney from entering into contracts waiving the principal's fundamental constitutional rights unless the document setting forth the power of attorney explicitly granted those rights. (*Kindred*, *supra*, 581 U.S. at pp. 252–253.) The Kentucky rule appeared neutral, but its sole application was to restrict the agent from " 'waiv[ing] his principal's fundamental constitutional rights to access the courts [and] to trial by jury[ ]' [citation]"—in other words, from entering into arbitration agreements on the principal's behalf. (*Id.* at p. 248.) The court was skeptical that the decision would apply to any other fundamental rights, asking, "what other rights, really? No Kentucky court, so far as we know, has ever before demanded that a power of attorney explicitly confer authority to enter into contracts implicating constitutional guarantees. Nor did the opinion below indicate that such a grant would be needed for the many routine contracts—executed day in and day out by legal representatives—meeting that description. For example, the Kentucky Constitution protects the 'inherent and inalienable' rights to 'acquir[e] and protect[ ] property' and to 'freely communicat[e] thoughts and opinions.' [(]Ky. Const. § 1.[)] But the state court nowhere cautioned that an attorney-in-fact would now need a specific authorization to, say, sell her principal's furniture or commit her principal to a non-disclosure agreement." (*Kindred*, *supra*, at p. 253.) Because the Kentucky rule was, in effect, "tailor-made to arbitration agreements—subjecting them,

17

by virtue of their defining trait, to uncommon barriers," it was preempted by the FAA. (*Id.* at p. 252.)

There is no basis for believing that California law regarding browsewrap is limited in this way. Even if most published cases on the subject have been in the context of arbitration, we are aware of one federal case decided under California law addressing browsewrap in a different context, namely an alleged violation of a website's terms of use by a competitor scraping the website for data. (*Pollstar v. Gigmania, Ltd.* (E.D.Cal. 2000) 170 F.Supp.2d 974; see also *Register.com, Inc. v. Verio, Inc.* (2d Cir. 2004) 356 F.3d 393, 395 [similar issue under New York law].) The issue of scraping is common enough that Professor Mark A. Lemley discussed it in detail in a law review article on Internet contract formation. (See Lemley, *Terms of Use, supra,* 91 Minn. L. Rev. at pp. 472–477.) The terms of use document from Interactive's website occupies 15 pages of the appellate record, but the section on arbitration takes up just more than one full page. The document also includes sections regarding scraping and commercial use of the content, the intellectual property rights of user-submitted content, and restrictions on attempting to circumvent the site's security features, among many other subjects, any of which could potentially be the subject of litigation. There is no reason to believe a court would address the issue of contract formation differently in a case on a subject other than arbitration.

Interactive also argues that preemption is required because California's law on contract formation "undermines the strong policy favoring arbitration." In Interactive's view, "the FAA's purpose is to give preference (instead of mere equality) to arbitration provisions." (*Mortensen v. Bresnan Communications,*

18

*LLC* (9th Cir. 2013) 722 F.3d 1151, 1160.)  But the Supreme Court has repeatedly rejected this idea, holding that the FAA "requires courts to place arbitration agreements 'on equal footing with all other contracts.' " (*Kindred*, *supra*, 581 U.S. at p. 248, quoting *DIRECTV, Inc. v. Imburgia*, *supra*, 577 U.S. at p. 54.) Or, in other words, "[t]he policy [favoring arbitration] is to make 'arbitration agreements as enforceable as other contracts, but not more so.' " (*Morgan v. Sundance, Inc.* (2022) 596 U.S. 411, 418 [142 S.Ct. 1708, 212 L.Ed.2d 753].)  Interactive argues that courts must "resolve all doubts in favor of arbitration" (*Sandquist v. Lebo Automotive, Inc.*, *supra*, 1 Cal.5th at p. 247; accord, *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 62 & fn.8), but that rule applies to the interpretation of " 'ambiguities as to the scope of the arbitration clause.' " (*Mastrobuono*, *supra*, at p. 62.)  Interactive cites no law suggesting that it overrides the principle that, "The party seeking arbitration bears the burden of proving the existence of an arbitration agreement . . . ." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.)

Finally, Interactive takes issue with Code of Civil Procedure section 1290.2, the statute that establishes rules for hearings on motions to compel arbitration, arguing that it discriminates against arbitration by requiring a party seeking arbitration to prove the existence of an arbitration agreement "in a limited summary proceeding applicable . . . solely to requests to compel arbitration . . . without the full range procedural and evidentiary protections."  The California Supreme Court rejected the argument that this statute is preempted in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 409,

reasoning that "[Code of Civil Procedure s]ections 1281.2 and 1290.2 are neutral as between state and federal law claims for enforcement of arbitration agreements. They display no hostility to arbitration as an alternative to litigation; to the contrary, the summary procedure provided, in which the existence and validity of the arbitration agreement is decided by the court in the manner of a motion, is designed to further the use of private arbitration as a means of resolving disputes more quickly and less expensively than through litigation." We are bound by the decision of our Supreme Court on the subject. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## DISPOSITION

The trial court's order is affirmed. Weeks is awarded his costs on appeal.

CERTIFIED FOR PUBLICATION

WEINGART, J.

We concur:

CHANEY, J.

BENDIX, Acting P. J.